******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

## JERMAINE ROSS *v.* COMMISSIONER
## OF CORRECTION
## (AC 45062)

Bright, C. J., and Prescott and Moll, Js.

*Syllabus*

The petitioner, who had been convicted, on a plea of guilty, of the crime
of kidnapping in the second degree, sought a writ of habeas corpus,
claiming, inter alia, that he was actually innocent and that his court-
appointed standby counsel, R, had rendered ineffective assistance when
the petitioner represented himself during his second criminal trial. At
the petitioner's first criminal trial, the state introduced evidence that
the petitioner had lured the victim into his car by promising her money
in exchange for sex and then drove to a market where video footage
from two surveillance cameras showed the victim getting out of the car,
entering the market to make a purchase and then reentering the car
before it was driven away. When the victim told the petitioner that she
had changed her mind and asked that he drop her off, he refused and
drove to a parking lot where he sexually assaulted her. After the petition-
er's first criminal trial ended in a mistrial, the petitioner invoked his
right to represent himself at his retrial and proceeded with R acting
as standby counsel. During jury selection, the trial court ordered the
petitioner removed from the courtroom because of his belligerent con-
duct and directed R to continue with jury selection. The petitioner
resumed self-representation before the completion of jury selection and
his acceptance of the state's plea offer. The habeas court granted in
part the motion filed by the respondent Commissioner of Correction to
dismiss the petitioner's habeas petition. At the habeas trial, the petitioner
claimed, inter alia, that inconsistencies in the victim's recounting of
events and discrepancies in the video surveillance footage that under-
mined the victim's testimony that she was at the market with him consti-
tuted newly discovered evidence that established his claim of actual
innocence. The petitioner further claimed that R had rendered ineffective
assistance by failing to inform him of a potential legal claim pertaining
to the interception by the Department of Correction of his mail that
contained his defense strategy, which thereafter was provided to the
state's attorney. The habeas court denied the petitioner's actual inno-
cence claim, concluding that he had not presented any newly discovered
evidence that was not available at the time of the underlying criminal
proceedings. The court also determined that the petitioner's ineffective
assistance claim was without merit, reasoning that, once he decided to
represent himself, he had no right to the effective assistance of counsel
in any capacity. The habeas court thereafter rendered judgment dismiss-
ing the habeas petition, from which the petitioner, on the granting of
certification, appealed to this court. *Held*:

1. The habeas court did not err in rejecting the petitioner's claim that he
was actually innocent, as he failed to present any newly discovered
evidence to establish his innocence by clear and convincing evidence:

   a. This court rejected the petitioner's assertion that evidence need not
   be newly discovered to establish a claim of actual innocence, as that
   assertion was flatly contradictory to this court's binding precedent that
   an actual innocence claim must be based on newly discovered evidence.

   b. This court concluded that, even if there were no requirement that
   evidence must be newly discovered to establish an actual innocence
   claim, the petitioner's efforts to undermine the credibility of the victim's
   testimony by calling into question the reliability of the surveillance video
   was unavailing, because, even if the reliability of the surveillance video
   were called into question, undermining one piece of evidence did not
   constitute affirmative evidence of his actual innocence; moreover, the
   evidence the petitioner adduced concerning the surveillance video
   merely attempted to discredit a portion of the state's evidence at his
   underlying criminal trial and would not negate the other ample evidence
   of his guilt that was admitted at that trial, which included evidence that
   his DNA was found in the victim, evidence of tire marks at the crime

scene that matched the petitioner's vehicle, cell phone location data placing him near the scene at the relevant time, and evidence that the police found him in the same location several days later with another sex worker in a car that matched the vehicle described by the victim.

2. There was no merit to the petitioner's claim that the habeas court improperly failed to conclude that R had rendered ineffective assistance in his role as standby counsel, as the petitioner had no right to the effective assistance of counsel in any capacity after he waived his sixth amendment right to counsel and exercised his right to represent himself: the petitioner cited no legal authority to support his contention that R had a duty to inform him of potential legal issues in connection with his intercepted prison mail, the evidence showed that R's role as standby counsel was limited in that he neither examined witnesses nor argued to the jury but mostly responded to requests from the petitioner, R's actions readily fell into the category of assisting the petitioner with overcoming routine procedural obstacles to the completion of tasks the petitioner wanted to complete, and, despite the assistance R provided by offering the petitioner unsolicited advice and conducting voir dire on the day the petitioner was removed from the courtroom, the petitioner unmistakably represented himself through the conclusion of his criminal matter, during which he filed and argued numerous motions, represented himself at multiple hearings and, on several occasions, reaffirmed to the trial court his desire to represent himself; moreover, nothing in the record indicated that the petitioner was confused about the role of standby counsel, he never expressed to the trial court any uncertainty about R's role, and he presented no evidence to the habeas court that he relied on R to provide unsolicited advice or to identify and inform him of potential legal issues.

3. The petitioner could not prevail on his claim that the habeas court improperly dismissed that count of his habeas petition in which he alleged that his rights to due process and the assistance of counsel were violated as a result of the interception of his prison mail: contrary to the petitioner's contention that those allegations related to the knowing and voluntary nature of his guilty plea, they did not sufficiently demonstrate an interrelationship between the plea and the alleged ineffective assistance by R such that it could be said that the plea was not made knowingly and voluntarily, as there could be no ineffective assistance of counsel because the petitioner represented himself, the count at issue could not reasonably be read to set forth a claim that the plea was not made knowingly and voluntarily, and this court declined to consider the petitioner's memorandum of law opposing the respondent's motion to dismiss, in which he argued for the first time that his plea was not made knowingly or voluntarily, as a memorandum of law is not a proper vehicle for supplementing factual allegations in a habeas petition; moreover, a plain reading of the allegations at issue showed that they asserted only a claim that the petitioner had lost an opportunity to have the charges against him dismissed because of the interception of his mail, as the count at issue contained no allegations relating to the knowing and voluntary nature of his guilty plea, at no point did he amend his habeas petition to allege that the plea was unknowingly and involuntarily made due to the interception of his mail, and, as alleged in the count at issue, the petitioner was fully aware of the interception of his mail prior to entering his guilty plea; furthermore, because a plea is made knowingly and voluntarily regardless of whether a defendant is made aware of every motion being waived by entering the plea, the petitioner knowingly and willingly assumed that risk and had been advised of it by the trial court when he chose to represent himself.

Argued October 3, 2022—officially released January 17, 2023

*Procedural History*

Amended petition for a writ of habeas corpus, brought to the Superior Court in the judicial district of Tolland, where the court, *Chaplin, J.*, granted in part the motion to dismiss filed by the respondent Commissioner of Correction; thereafter, the petitioner withdrew the petition in part; subsequently, the case was tried to the court, *Oliver, J.*; judgment denying the petition, from which the petitioner, on the granting of certifica-

tion, appealed to this court. *Affirmed.*

*Naomi T. Fetterman*, assigned counsel, for the appellant (petitioner).

*Nathan J. Buchok*, deputy assistant state's attorney, with whom, on the brief, were *Matthew C. Gedansky*, state's attorney, and *Jo Anne Sulik*, senior assistant state's attorney, for the appellee (respondent).

*Opinion*

BRIGHT, C. J. Following the granting of certification to appeal, the petitioner, Jermaine Ross, appeals from the judgment of the habeas court denying his second revised, amended petition for a writ of habeas corpus. On appeal, the petitioner claims that the habeas court improperly (1) rejected his actual innocence claim, (2) concluded that he failed to establish that standby counsel provided ineffective assistance, and (3) dismissed count two of the habeas petition.[1] We disagree and, accordingly, affirm the judgment of the habeas court.

The habeas court set forth the following relevant factual and procedural background in its memorandum of decision. "The petitioner was the defendant in *State v. Ross*, Docket No. CR-10-0642126-S, in the judicial district of Hartford. The petitioner was charged with one count of sexual assault in the first degree in violation of General Statutes § 53a-70 (a) (1), and one count of kidnapping in the first degree in violation of General Statutes § 53a-92 (a) (2) (A). Although the petitioner was initially represented by two different attorneys prior to trial, he exercised his right to represent himself. The petitioner's first criminal trial proceeded as far as jury deliberations but resulted in a mistrial after the jury was unable to reach a unanimous verdict. After the mistrial, the petitioner was briefly represented by a third attorney, who was discharged, and the petitioner [was assigned] his fourth counsel, Attorney Aaron Romano. The petitioner again invoked his right to represent himself, which was granted [after he was fully canvassed by the court, *Dewey*, *J.*], and he proceeded with the assistance of Romano acting in the capacity of standby counsel.

"Jury selection for a second trial commenced with the petitioner representing himself and Romano [acting] as standby counsel. However, after the petitioner indicated on June 4, 2013, that he did not want to proceed with the trial that day, he was ordered removed from the courtroom. Romano took over representation and continued with the jury selection, although the petitioner resumed representing himself before jury selection completed. On January 24, 2014, the state conveyed a plea offer to the petitioner, which he accepted that day. In exchange for pleading guilty to one count of kidnapping in the second degree in violation of General Statutes § 53a-94, the petitioner would receive a total effective sentence of ten years of incarceration, suspended after the service of five years, followed by five years of probation. . . . The petitioner pleaded guilty pursuant to the *Alford* doctrine[2] and, after a thorough canvass by the court, *Alexander*, *J.*, was sentenced in accordance with the plea agreement.

"The prosecutor put the following facts on the record to support the petitioner's guilty plea: '[T]his occurred

on [November 22, 2009]. The [petitioner] had picked up a woman on Webster Street in Hartford, who admitted to the police that she was working as a [sex worker] at the time. He had lured her into his car with the promise of money in exchange for sex [and] began driving her to another location. Along the way, she changed her mind [and] asked to be brought back to Hartford. He did not follow those wishes [and] took her to Farmington where the other events unfolded.' . . . The court then described to the petitioner the elements of kidnapping in the second degree and canvassed him to determine whether he understood what the state would have to prove at trial. The petitioner acknowledged that he understood the court's explanation." (Citations omitted; footnote in original.)

On May 1, 2014, the petitioner filed the underlying habeas petition as a self-represented party. The court subsequently appointed counsel to represent the petitioner, and assigned counsel filed the operative second revised, amended petition. In the operative petition, which included eight counts, the petitioner alleged that (1) he is actually innocent, (2) his right to due process and his right to counsel were violated by the Department of Correction's having intercepted mail intended for his attorney that contained his defense strategy, (3) his rights to due process and to a fair trial were violated by the prosecutor's alleged *Brady*[3] violation, (4) his right to due process was violated (a) when the criminal proceedings against him continued without his presence after he was removed from the courtroom and standby counsel took over representation, and (b) because the petitioner's decision to plead guilty to kidnapping in the second degree was not made knowingly, intelligently, and voluntarily, as he did not know or understand that sex offender treatment would be a condition of his probation, (5) his right to self-representation was violated, (6) his right to the effective assistance of standby counsel was violated, (7) his right to the effective assistance of counsel was violated constructively, and (8) his right to counsel was violated because his waiver of that right was ineffective.

On June 3, 2019, the respondent, the Commissioner of Correction, pursuant to Practice Book § 23-29, filed a motion to dismiss counts one, two, three, five, six, seven, and the portion of count four involving the continuation of jury selection in the petitioner's criminal trial after he had been removed from the courtroom. On June 25, 2019, the petitioner filed a memorandum of law in opposition to the motion, and the parties appeared in court and argued the motion to dismiss and the opposition thereto on September 5, 2019. At the hearing, the respondent's counsel clarified that she was not moving to dismiss the portion of count four relating to sex offender treatment. Further, habeas counsel represented to the court that he had filed a motion in the petitioner's criminal case requesting that

the trial court preclude the imposition of sex offender treatment and stated that the issue would "very likely become moot if this case goes forward . . . ." The habeas court responded that, until the trial court addressed the pending motion regarding sex offender treatment, "there is nothing for this court to address on that point . . . ."

Following the hearing, the court, *Chaplin, J.*, issued a memorandum of decision granting the respondent's motion to dismiss as to counts two, three, five, seven, and the challenged portion of count four pertaining to the petitioner's removal from the courtroom on June 4, 2013,[4] and denying the motion as to counts one and six. The petitioner subsequently withdrew count eight, and the matter proceeded to trial on count one, in which the petitioner claimed that he was actually innocent, and on count six, in which he alleged ineffective assistance of standby counsel.[5]

A two day habeas trial was held on January 15 and February 4, 2021. In a memorandum of decision filed July 8, 2021, the court, *Oliver, J.*, denied the petition. The court stated: "The petitioner testified in support of his claims and presented the testimony of former Detective Tracy Enns . . . Romano, and Victor Sanchez. The petitioner entered documents, mostly consisting of transcripts, into evidence, as well as a flash drive containing two videos. The respondent entered one exhibit into evidence. The petitioner and the respondent filed posttrial briefs."

The court denied the petitioner's actual innocence claim on the grounds that "the petitioner [had] failed to present any newly discovered evidence that was not available at the time of the criminal proceedings," and that "[t]here [was] no evidence affirmatively establishing that the petitioner did not commit the charged offense and is actually innocent." As to the petitioner's ineffective assistance of counsel claim, the court, quoting *State* v. *Oliphant*, 47 Conn. App. 271, 281, 702 A.2d 1206 (1997), cert. denied, 244 Conn. 904, 714 A.2d 3 (1998), found that the claim was "without merit because after deciding to proceed pro se, [the petitioner had] no constitutional right to the effective assistance of counsel in any capacity"; (internal quotation marks omitted); and, because there is no constitutional right to standby counsel, the petitioner could not prove that standby counsel was ineffective. The court further concluded that the petitioner had failed to prove that Romano failed to perform his limited standby counsel duties or that Romano had assumed the role of counsel other than briefly during voir dire of potential jurors. Finally, the court concluded that there was "no other credible evidence that Romano overrode or infringed upon the petitioner's right to represent himself." On July 19, 2021, the petitioner filed a petition for certification to appeal, which the habeas court granted. This appeal

followed. Additional facts and procedural history will be set forth as necessary.

## I

The petitioner first claims that the habeas court improperly denied his actual innocence claim. This claim is without merit.

We begin by setting forth the law governing claims of actual innocence and the corresponding standard of review. "Actual innocence, also referred to as factual innocence . . . is different than legal innocence. Actual innocence is not demonstrated merely by showing that there was insufficient evidence to prove guilt beyond a reasonable doubt. . . . Rather, actual innocence is demonstrated by affirmative proof that the petitioner did not commit the crime. . . .

"[T]he proper standard for evaluating a freestanding claim of actual innocence . . . is twofold. First, the petitioner must establish by clear and convincing evidence that, taking into account all of the evidence— both the evidence adduced at the original criminal trial and the evidence adduced at the habeas corpus trial— he is actually innocent of the crime of which he stands convicted. Second, the petitioner must also establish that, after considering all of that evidence and the inferences drawn therefrom as the habeas court did, no reasonable fact finder would find the petitioner guilty of the crime. . . .

"Our Supreme Court . . . clarified the actual innocence standard in *Gould* [v. *Commissioner of Correction*, 301 Conn. 544, 560–61, 22 A.3d 1196 (2011)]. In *Gould*, the habeas court found that the petitioner was entitled to relief on his actual innocence claim after the recantations of testimony that was the sole evidence of [the petitioner's] guilt. . . . On appeal, our Supreme Court held that the clear and convincing burden . . . requires more than casting doubt on evidence presented at trial and the burden requires the petitioner to demonstrate actual innocence through affirmative evidence that the petitioner did not commit the crime. . . .

"Affirmative proof of actual innocence is that which might tend to establish that the petitioner *could not* have committed the crime even though it is unknown who committed the crime, that a *third party* committed the crime or that *no* crime actually occurred. . . . Clear and convincing proof of actual innocence does not, however, require the petitioner to establish that his or her guilt is a factual impossibility. . . .

"With respect to the first component of the petitioner's burden, namely, the factual finding of actual innocence by clear and convincing evidence . . . [t]he appropriate scope of review is whether, after an independent and scrupulous examination of the entire record, we are convinced that the finding of the habeas court that the petitioner is actually innocent is sup-

ported by substantial evidence." (Citations omitted; emphasis in original; internal quotation marks omitted.) *Jackson* v. *Commissioner of Correction*, 149 Conn. App. 681, 706–707, 89 A.3d 426 (2014), appeal dismissed, 321 Conn. 765, 138 A.3d 278, cert. denied sub nom. *Jackson* v. *Semple*, 580 U.S. 1035, 137 S. Ct. 602, 196 L. Ed. 2d 482 (2016); see also *Miller* v. *Commissioner of Correction*, 242 Conn. 745, 791–92, 700 A.2d 1108 (1997); *Myers* v. *Commissioner of Correction*, 215 Conn. App. 592, 614, 284 A.3d 309 (2022); *Ortiz* v. *Commissioner of Correction*, 166 Conn. App. 635, 659–60, 145 A.3d 937, cert. denied, 323 Conn. 906, 150 A.3d 680 (2016).

Although our Supreme Court has yet to address the issue of whether an actual innocence claim must be supported by newly discovered evidence; see *Gould* v. *Commissioner of Correction*, supra, 301 Conn. 551 n.8; this court has consistently held that "[a] claim of actual innocence must be based on newly discovered evidence. . . . This evidentiary burden is satisfied if a petitioner can demonstrate, by a preponderance of the evidence, that the proffered evidence could not have been discovered prior to the petitioner's criminal trial by the exercise of due diligence." (Internal quotation marks omitted.) *Ampero* v. *Commissioner of Correction*, 171 Conn. App. 670, 687, 157 A.3d 1192, cert. denied, 327 Conn. 953, 171 A.3d 453 (2017).

The following additional facts and procedural history are relevant to our resolution of this claim. At the petitioner's first criminal trial, the victim testified that, on the evening of November 22, 2009, she met a man she later identified as the petitioner in Hartford, where she was working as a sex worker. She agreed to get into the petitioner's car after he told her he would pay her forty dollars in exchange for sex. The petitioner then drove to Victoria's Market where the victim purchased a condom. The victim then returned to the car with the condom, got into the passenger seat, and the petitioner began driving. The state introduced video surveillance footage from Victoria's Market of the victim exiting the petitioner's vehicle, entering the store, and making a purchase on that evening.

The victim testified that, during the drive, she told the petitioner that she wanted to go home and asked that he drop her off. The petitioner refused and became agitated. The petitioner took her against her will to the parking lot of a landscaping company where he proceeded to sexually assault her. The petitioner thereafter removed the victim from his car and drove away. The victim then made her way out to the road where she flagged down a passing motorist for assistance.

While the victim was speaking with the motorist, a Farmington police officer pulled over to assist. The victim informed the officer that she had been sexually assaulted and accompanied the officer in his police cruiser to the location where the assault had occurred.

She informed the officer that her assailant had been driving a black Nissan Maxima. The victim was eventually taken to the University of Connecticut Medical Center emergency department where she was examined by medical personnel who administered a sexual assault kit and gathered physical evidence from her body.

At trial, the state introduced evidence establishing that the petitioner's DNA matched DNA of spermatozoa recovered from the victim, that the tires on the petitioner's vehicle matched the tire marks at the crime scene, and that the petitioner's cell phone was in the area of the assault at the relevant time. The state also introduced evidence that, on November 27, 2009, five nights after the assault, Farmington police located the petitioner parked in the same location where the assault had occurred. The petitioner was seated in his black Nissan Maxima with another sex worker.

In count one of the habeas petition, the petitioner alleged that newly discovered evidence in the form of cell phone records, computer records, and "challenges to the reliability of the forensic evidence" established that he was actually innocent of the charge of kidnapping in the second degree. At the habeas trial, the petitioner testified in support of his claim and presented the testimony of Sanchez, whose family owned Victoria's Market, and Enns, who, at the time of the events at issue, was employed in the Farmington Police Department. The petitioner also introduced the transcripts from the original criminal trial and two surveillance videos from Victoria's Market, which had been introduced at trial. The first video captures the interior of Victoria's Market and shows the victim entering the market and making a purchase. The second video depicts a view looking out into the parking area of Victoria's Market and shows the victim exiting a vehicle that matched the victim's description of the petitioner's vehicle and then entering the market.

At the habeas trial, Enns testified that she retrieved the video evidence directly from Victoria's Market and downloaded it onto a flash drive. She obtained the video to "corroborate what the victim was telling us in the case . . . ." Enns confirmed that the videos did corroborate a portion of the victim's statement and that the videos were introduced at the petitioner's criminal trial for that purpose.

In an effort to call into question the authenticity of the Victoria's Market videos, the petitioner called Sanchez as a witness at the habeas trial. Sanchez testified that there had never been a camera located outside of Victoria's Market, but he could not recall the exact location of the security cameras in 2009 and acknowledged that the cameras had been replaced and that the camera angles may have changed. Before the video evidence was shown to Sanchez and the court, habeas counsel asked Sanchez: "Would it have been possible

for someone to produce camera footage from outside the store in 2009?" Sanchez responded: "How can—how can you do that? There's no camera outside." After he was shown the video of the exterior of the market, Sanchez initially stated that he "[didn't] think" he was familiar with the camera angle depicted in that video. On cross-examination, however, Sanchez clarified that there was a security camera located inside Victoria's Market that captured the front of the store, cars outside the front door, the street outside, and people coming into the store. Upon viewing the video of the exterior of the market again, Sanchez confirmed that the images shown in that video looked like what one could see from an interior camera in 2009. On redirect examination, habeas counsel asked Sanchez: "Is there something that makes you question that [the video of the exterior of the market] might not be from the store or from the cameras?" Sanchez responded: "No, no."

Although the petitioner claimed in his habeas petition that his cell phone and computer records would prove he was innocent, no such records were offered at his habeas trial. The petitioner also did not challenge the DNA evidence introduced at his first criminal trial. The petitioner did testify, however, that, on the night of the kidnapping, November 22, 2009, he was in Bristol working on several school papers and that, just after midnight, he was on the phone with the Department of Labor filing an unemployment claim.

The petitioner argued that questions about the surveillance video undermined the victim's testimony that she was at Victoria's Market with him. In particular, he pointed to Sanchez' testimony that there was no camera on the outside of Victoria's Market and that Sanchez, on direct examination, did not recognize the camera angle in the video displaying the petitioner's car in the parking lot of Victoria's Market. The petitioner also asserted that "a review of the video exhibits that were entered into evidence as the surveillance videos seized by police and played by the prosecuting authority at the petitioner's criminal trial makes it clear that the two videos do not meaningfully correspond. Individuals that enter and leave the market on the in-store camera are not seen outside in the parking lot on the other video." According to the petitioner, "[i]f [the videos] could have been undermined as false or fabricated, a jury would have been left with a firm conviction that the alleged victim's version of events had been falsified. This, in conjunction with the petitioner's testimony that he was at home doing schoolwork on the evening of the alleged incident, would display convincingly that the petitioner did not commit the crime or that no crime was committed."

The habeas court rejected the petitioner's actual innocence claim, concluding that the petitioner "failed to present any newly discovered evidence that was not

available at the time of the criminal proceedings," and that there was "no evidence affirmatively establishing that the petitioner did not commit the charged offense and is actually innocent."

On appeal, the petitioner claims that the evidence introduced at the habeas trial relating to the video from Victoria's Market constitutes sufficient affirmative evidence of his actual innocence. In advancing his claim, the petitioner challenges the requirement that evidence must be newly discovered to support a claim of actual innocence. He argues that, because a writ of habeas corpus acts as a " 'bulwark against convictions that violate fundamental fairness' "; *Engle* v. *Isaac*, 456 U.S. 107, 126, 102 S. Ct. 1558, 71 L. Ed. 2d 783 (1982); "there is simply no reasoned basis to require that evidence must be newly discovered in order for a petitioner to establish his claim of actual innocence." The respondent, conversely, argues that the habeas court, following the well settled precedent of this court, correctly concluded that the petitioner failed to present any newly discovered evidence in support of his claim of actual innocence. The respondent further claims that, regardless of whether it was newly discovered, the evidence presented by the petitioner at the habeas trial fell below the standard required to demonstrate actual innocence. We agree with the respondent.

A

On appeal, the petitioner does not meaningfully challenge the habeas court's conclusion that the evidence relating to the video from Victoria's Market was not newly discovered. The videos were admitted as evidence at the petitioner's first criminal trial, and there is no evidence that Sanchez was not available to testify at that trial. Rather, the petitioner argues that "the question should [not be] whether the evidence is newly discovered but whether [the petitioner] is actually innocent of the crime for which he stands convicted."[6] We reject the petitioner's argument because it is flatly contradictory to our binding precedent.

This court has held repeatedly that an actual innocence claim must be based on newly discovered evidence. See, e.g., *Outing* v. *Commissioner of Correction*, 190 Conn. App. 510, 540, 211 A.3d 1053, cert. denied, 333 Conn. 903, 214 A.3d 382 (2019), cert. denied sub nom. *Outing* v. *Cardona*, U.S. , 140 S. Ct. 1166, 206 L. Ed. 2d 212 (2020); *Weinberg* v. *Commissioner of Correction*, 112 Conn. App. 100, 118–19, 962 A.2d 155, cert. denied, 291 Conn. 904, 967 A.2d 1221 (2009); *Williams* v. *Commissioner of Correction*, 41 Conn. App. 515, 523–29, 677 A.2d 1 (1996), appeal dismissed, 240 Conn. 547, 692 A.2d 1231 (1997); *Thompson* v. *Commissioner of Correction*, Superior Court, judicial district of Tolland, Docket No. CV-12-4004330 (August 4, 2014) (reprinted at 172 Conn. App. 141, 157–58, 158 A.3d 815), appeal dismissed, 172 Conn. App. 139, 158

A.3d 814, cert. denied, 325 Conn. 927, 169 A.3d 232 (2017). "[I]t is axiomatic that one panel of this court cannot overrule the precedent established by a previous panel's holding." *Connelly* v. *Commissioner of Correction*, 149 Conn. App. 808, 815, 89 A.3d 468 (2014); see also *State* v. *Houghtaling*, 326 Conn. 330, 343, 163 A.3d 563 (2017) ("Appellate Court panel appropriately considered itself bound by its own precedent"), cert. denied, U.S. , 138 S. Ct. 1593, 200 L. Ed. 2d 776 (2018). Because this court is bound to follow the precedent from other panels of this court, the petitioner's claim that newly discovered evidence should not be required to establish a claim of actual innocence must be rejected.[7] Consequently, because the petitioner failed to present any newly discovered evidence in support of his actual innocence claim, the habeas court properly rendered judgment in favor of the respondent on count one of the habeas petition.

B

Furthermore, even if there was no newly discovered evidence requirement, we agree with the habeas court's conclusion that the petitioner's claim fails because the supporting evidence he presented did not constitute clear and convincing affirmative evidence of his actual innocence. See, e.g., *Jackson* v. *Commissioner of Correction*, supra, 149 Conn. App. 706 ("the clear and convincing burden . . . requires the petitioner to demonstrate actual innocence through affirmative evidence that the petitioner did not commit the crime" (internal quotation marks omitted)).

On appeal, the petitioner argues that Sanchez' testimony and the alleged discrepancies in the surveillance videos undermine the credibility of the victim's testimony, leaving the petitioner's alibi testimony as the only credible evidence as to whether he was involved in any kidnapping and sexual assault of the victim. In further support of his claim, the petitioner points to several inconsistencies in the evidence regarding the victim's recounting of events. Specifically, he points to the testimony of the motorist that the victim had said she was thrown out of a truck and, by contrast, to the testimony of one of the responding police officers that the victim said she had been pushed out of a Nissan Maxima. The petitioner also relies on the fact that the victim informed the police officers that she had been sexually assaulted outside the car on the pavement, whereas she later reported and testified that the assault took place in the backseat of the car. The petitioner then points to the testimony of a police officer that it had been raining on the day of the assault and that he did not recall seeing any mud on the victim. On the basis of these inconsistencies, the petitioner argues: "As . . . Enns testified, the purpose of the surveillance video was to provide independent corroboration for the [victim's] allegations. . . . [The victim's] credibility at

the [first] criminal trial was already severely impeached, the jury [having been] unable to reach a verdict of guilty. The surveillance video and corresponding identification of the [victim] by . . . Enns bolstered the [victim's] testimony, providing extrinsic support of veracity." (Citation omitted.) Without such corroboration, the petitioner asserts, the respondent cannot surmount the inconsistencies within the victim's testimony. Thus, "[w]hen the evidence presented at the criminal trial is coupled with . . . Sanchez' testimony at the habeas trial, this evidence is sufficient to 'induce in the mind of the trier a reasonable belief' that [the petitioner] is actually innocent." We are not persuaded.

Initially, we agree with the habeas court that the evidence adduced at the habeas trial did not undermine the reliability of the video depicting the exterior of Victoria's Market. Although Sanchez initially testified that there was no camera located outside of Victoria's Market, after viewing the actual video in question, he clarified that there was a camera mounted inside Victoria's Market that looked out to the parking lot and that the images on the video of the exterior depicted what one would see from that camera in 2009. Further, as determined by the habeas court, the activities captured by both surveillance videos depict a consistent "chronological flow: the car arrives (outside view 02:16:17); the individual exits the car and begins walking to the store (outside view 02:16:27); the entrance door opens and the individual enters the store (inside view 02:16:41); the individual exits the store (inside view 02:16:55); the individual passes in front of the camera and goes to the waiting vehicle (outside view 02:17:05); and the vehicle leaves the parking lot (outside view 02:17:33)." There are no apparent inconsistencies between the two videos.

Moreover, even if we assume, arguendo, that the evidence introduced at the habeas trial did call into question the reliability of the videos, undermining one piece of evidence against the petitioner does not constitute "affirmative evidence" that he is actually innocent. See *Gould* v. *Commissioner of Correction*, supra, 301 Conn. 561. To prove an actual innocence claim, "petitioners must affirmatively demonstrate that they are in fact innocent" by establishing, through clear and convincing evidence, that they did not commit the crime, a third party committed the crime, or no crime occurred. (Emphasis omitted.) Id. This burden is not met by simply "[d]iscrediting the evidence on which the conviction rested . . . ." Id., 567; see also *Myers* v. *Commissioner of Correction*, supra, 215 Conn. App. 616–17.

The evidence produced at the petitioner's habeas trial did not unquestionably establish the petitioner's innocence but was offered merely to attempt to discredit a portion of the state's evidence at the underlying criminal trial. Thus, the petitioner did not satisfy the clear and

convincing standard. Undermining the credibility of the victim's testimony by questioning the reliability of the surveillance video would not negate the other ample evidence of the petitioner's guilt that was admitted at his criminal trial, which included evidence that the petitioner's DNA was found in the victim, evidence that tire marks at the crime scene matched the petitioner's vehicle, cell phone location data placing him near the scene at the relevant time, and evidence that the petitioner was found in the same location several days later with another sex worker in a car matching the vehicle described by the victim. At most, undermining the credibility of the victim's testimony could have raised a reasonable doubt in the minds of the jury. That, however, is not enough to satisfy the clear and convincing standard under *Gould* and *Miller*. See *Gould* v. *Commissioner of Correction*, supra, 301 Conn. 560–61 ("Actual innocence is not demonstrated merely by showing that there was insufficient evidence to prove guilt beyond a reasonable doubt. . . . Rather, actual innocence is demonstrated by affirmative proof that the petitioner did not commit the crime." (Citations omitted.)); *Miller* v. *Commissioner of Correction*, supra, 242 Conn. 795 ("the clear and convincing evidence standard . . . *forbids relief whenever the evidence is* loose, equivocal or *contradictory*" (emphasis added; internal quotation marks omitted)).

Accordingly, for the foregoing reasons, we conclude that the habeas court did not err in rejecting the petitioner's actual innocence claim.

## II

The petitioner next claims that the habeas court improperly concluded that he failed to prove that his standby counsel, Romano, had provided ineffective assistance. In particular, the petitioner argues, "the actions of standby counsel . . . served to distort and blur the lines [between retained or assigned] counsel and standby counsel, and the result was that the petitioner was placed in a position where it was impossible for him to discern what was within and what was beyond the scope of that relationship." (Internal quotation marks omitted.) He argues that, as a result of Romano's overreach in his role as standby counsel to that of acting as retained or assigned counsel, Romano had a duty to inform the petitioner of a potential legal claim under *State* v. *Lenarz*, 301 Conn. 417, 22 A.3d 536 (2011), cert. denied, 565 U.S. 1156, 132 S. Ct. 1095, 181 L. Ed. 2d 977 (2012),[8] which arose from the interception of the petitioner's prison correspondence prior to the petitioner's first criminal trial. The respondent argues that, "by knowingly and intelligently waiving his sixth amendment right to counsel and electing to represent himself, the petitioner no longer had a right to effective representation of any kind and cannot obtain habeas relief based on a claim that standby counsel

rendered deficient performance." We agree with the respondent.

A sixth amendment claim of ineffective assistance of counsel is necessarily premised on the fact that the petitioner was represented by counsel. In addition to the right to effective assistance of counsel, the sixth amendment also embodies a right to self-representation. See *Faretta* v. *California*, 422 U.S. 806, 819, 95 S. Ct. 2525, 45 L. Ed. 2d 562 (1975). Notably, "[t]he right to counsel and the right to self-representation present mutually exclusive alternatives. A criminal defendant has a constitutionally protected interest in each, but since the two rights cannot be exercised simultaneously, a defendant must choose between them." (Internal quotation marks omitted.) *State* v. *Connor*, 292 Conn. 483, 508, 973 A.2d 627 (2009). Therefore, when a defendant voluntarily and intelligently exercises his right to self-representation, he waives his sixth amendment right to counsel. See id. A defendant has a right to either represent himself or to be represented by counsel, but he does not have any right, under the federal or Connecticut constitutions, to hybrid representation. See, e.g., *State* v. *Gethers*, 197 Conn. 369, 384–87, 497 A.2d 408 (1985).

Pursuant to Practice Book § 44-4,[9] the court has discretion to appoint standby counsel for self-represented defendants in criminal matters. Although a court may appoint standby counsel, "a defendant does not have a state or federal constitutional right to standby counsel." *State* v. *Oliphant*, supra, 47 Conn. App. 281. "Absent a constitutional right to standby counsel, a defendant generally cannot prove standby counsel was ineffective." *United States* v. *Schmidt*, 105 F.3d 82, 90 (2d Cir.), cert. denied, 522 U.S. 846, 118 S. Ct. 130, 139 L. Ed. 2d 80 (1997). It follows that a self-represented petitioner has no grounds on which to claim ineffective assistance of standby counsel "because after deciding to proceed pro se, he [has] no constitutional right to the effective assistance of counsel in any capacity." *State* v. *Oliphant*, supra, 281; see also *State* v. *Kenney*, 53 Conn. App. 305, 327, 730 A.2d 119 (having chosen to represent himself, "defendant is the master of his fate and cannot . . . complain that he was denied the effective assistance of counsel"), cert. denied, 249 Conn. 930, 733 A.2d 851 (1999).

As this court noted in *Oliphant*, the United States Supreme Court has recognized an exception to this rule that allows a petitioner to assert a sixth amendment claim when standby counsel's actions interfered with the petitioner's right of self-representation, including his right to make tactical decisions and to maintain the appearance before the jury of one who is defending himself. See *State* v. *Oliphant*, supra, 47 Conn. App. 281, citing *McKaskle* v. *Wiggins*, 465 U.S. 168, 177–79, 104 S. Ct. 944, 79 L. Ed. 2d 122 (1984). In the present

case, the petitioner does not claim that Romano, as standby counsel, did too much and, hence, interfered with his right of self-representation. Instead, he claims that Romano did too little *after* giving the petitioner the impression that he would provide legal advice typically provided by retained or appointed counsel. We are not persuaded.

The following additional facts are relevant to our review of this claim. Following the mistrial of the petitioner's first criminal trial, Romano was appointed to represent the petitioner. On September 7, 2012, the petitioner informed the court that he wanted to discharge Romano and represent himself. That same day, due to the petitioner's disruptive behavior, the court, *Alexander, J.*, ordered a competency evaluation pursuant to General Statutes § 54-56d.[10] On the basis of the petitioner's evaluation, the court, *Dewey, J.*, found him competent on October 23, 2012. The court, *Dewey, J.*, thereafter canvassed the petitioner to ensure that he was knowingly and voluntarily waiving his right to counsel and advised him of the risks associated with self-representation. The petitioner stated that he understood the risks and still wanted to represent himself. The court then granted the petitioner's request, ordered Romano to act as standby counsel, and explained to the petitioner standby counsel's limited role.[11] The petitioner went on to represent himself at multiple hearings, filed and argued numerous motions and, on several occasions, reaffirmed his desire to continue to represent himself.

On June 4, 2013, the parties appeared in court for jury selection for the petitioner's retrial. During that day's proceedings, the petitioner refused to participate in jury selection. Because the petitioner had twice attempted to leave the courtroom and had acted in a belligerent fashion toward the court, the court ordered the petitioner removed from the courtroom. Despite the petitioner's statement that he did not want "Romano to be on my case, I don't want him as a standby," the court ordered Romano to act as full counsel to proceed with jury selection.[12] Romano conducted voir dire in the petitioner's absence for the remainder of the day. The following day, June 5, 2013, the petitioner returned to the courtroom and renewed his request to represent himself. Romano thereafter resumed his role as standby counsel, and the petitioner represented himself for the remainder of jury selection. The petitioner then fell ill and the matter was suspended.[13] On January 24, 2014, the petitioner entered a guilty plea pursuant to the *Alford* doctrine to one count of kidnapping in the second degree. The petitioner represented himself at the plea hearing with Romano acting as standby counsel.

At the habeas trial, Romano testified that he had assisted the petitioner as standby counsel by researching law, drafting and filing motions, and finding addresses

and contact information for potential witnesses, as well as being the petitioner's means of interacting with experts and investigators. Romano also recalled discussing with the petitioner cell phone records, tire mark evidence, experts, the Victoria's Market surveillance videos, and how to authenticate records.

Romano further testified that he explained to the petitioner his limitations in acting as standby counsel "in terms of what [he] could do with respect to [the petitioner's] requests." Romano testified, however, that he viewed it as his duty to apprise the petitioner of a potential issue or legal claim if one became apparent to him, even if it had not been raised by the petitioner. For example, Romano discussed immigration and deportation issues with the petitioner that could result from his conviction.

On cross-examination, Romano reiterated that, as standby counsel, he answered whatever questions the petitioner raised or asked him, tried to help engage experts, and approached the prosecutor at the petitioner's request to resolve the case via a plea agreement. Romano provided the petitioner with all of the discovery he received but complied with any court instructions that limited specific information (e.g., the redaction of the victim's name). After his role as standby counsel ceased, Romano refused to answer questions posed by the petitioner when the petitioner contacted his office seeking materials, case law or other items of interest. Romano informed the petitioner that he could provide him with names of attorneys the petitioner could consult for further legal advice. Nevertheless, Romano did assist the petitioner to some degree after the plea and sentencing by gathering parts of his file and some evidence.

At the habeas trial, the petitioner testified that his relationship with Romano "was respectful, but as far as helping [him] to pursue what [he] wanted to pursue . . . [Romano] wasn't helpful." The petitioner testified that, from the beginning, he had concerns about Romano's involvement in his case because Romano's reputation was not "good" among the petitioner's fellow inmates. The petitioner further testified that, initially, there was some confusion as to Romano's status as standby counsel, stemming from the fact that he had objected to Romano's being appointed as standby counsel, "but after considering how much work and . . . how [he was] going to go about doing stuff, [he] realized having someone, even though [he] may not like . . . even though [he] may disagree with this person . . . is better than having no one at all."

The petitioner recalled that his issues with his prior attorneys related to the fact that they did not seem "interested in" obtaining certain records that he believed would demonstrate his innocence. Similarly, in relation to Romano's actions as standby counsel, the

petitioner testified that "there were several things [he had] asked . . . Romano to do in the course of . . . being [his] standby counsel. And, again, they weren't done." In particular, the petitioner testified that he had asked Romano to send an investigator to Victoria's Market to take photographs of the building to demonstrate that there were no surveillance cameras in the parking lot but that Romano had not done so. The petitioner further testified that, although he discussed the plea with Romano, he discussed neither potential legal claims on appeal or on habeas, nor the elements of kidnapping with Romano.

In addition, the petitioner testified about a letter intercepted by the Department of Correction in November, 2010, prior to the first criminal trial. According to the petitioner, he was attempting to contact attorneys who might represent him. The letter detailed the procedural history and facts related to the petitioner's then pending charges and asked for assistance in his case. The intended recipient was "Mr. Michael Banks" in Philadelphia, Pennsylvania. Although the petitioner signed the letter with his own name, the return address on the envelope in which the letter was enclosed was "William Patterson, #259062, Walker C.I., 1153 East Street, South, Suffield, CT 06080."

At the habeas trial, Enns explained that, as part of the criminal investigation, Farmington police made a request to the Department of Correction, pursuant to established procedures, to review the correspondence the petitioner had sent while incarcerated. Enns noted that there is a procedure through which the petitioner could send legal correspondence while incarcerated, that the petitioner was made aware of the procedure, and that, if the petitioner had followed that procedure, any legal correspondence would not have been intercepted or reviewed by the Department of Correction. On cross-examination, the petitioner acknowledged sending letters in violation of Department of Correction regulations regarding legal correspondence.

As a result of the mail review, the Department of Correction provided the intercepted letter to the police and, consequently, to the state's attorney. The letter and a police report generated regarding the letter were submitted as evidence at the habeas trial. The report provided to the state's attorney reads: "This fax included a copy of an envelope addressed to Mr. Michael Banks with a return name of William Patterson #259062, and a letter written by [the petitioner]. In this letter he admits to using a ['friend's'] information to send this letter, because his mail is monitored and held. He is requesting assistance from Banks law firm, [denies] being involved in the sexual assaults, and details his case."

The letter was contained in the discovery materials given to Romano when he was acting as standby counsel

for the petitioner. At the habeas trial, Romano testified that he did not independently recall receiving in hand the state's discovery materials or providing them to the petitioner but, after reviewing his records, concluded that he had done so. Romano testified that, because the role of standby counsel is limited, when acting as standby counsel, he does not review discovery materials unless a defendant were to request that he do so. Therefore, Romano had no specific recollection of reviewing the discovery materials he provided to the petitioner and could not recall the letter or issues pertaining to the Department of Correction's interception of the letter.

On appeal, the petitioner claims that, because Romano took on more responsibility than that required of standby counsel, Romano "derivatively had a duty to inform the petitioner of potential legal issues arising from the petitioner's intercepted prison correspondence." The petitioner claims that, by failing to inform the petitioner of those potential legal issues, Romano "rendered deficient performance." In support of this argument, the petitioner points to Romano's testimony that he thought he may have given the petitioner guidance about matters that were "outside of the confines of issues [the petitioner] strictly brought" to him as requests for assistance, as well as Romano's statement that he believed it would be his "duty to inform [the petitioner] about a potential [legal issue]" outside of what the petitioner had discussed with him. The petitioner's claim is without merit.

The petitioner voluntarily and intelligently exercised his right to self-representation, waiving his sixth amendment right to counsel. Accordingly, the petitioner had no constitutional right to the effective assistance of counsel in any capacity. See, e.g., *State* v. *Wang*, 312 Conn. 222, 262–63 n.37, 92 A.3d 220 (2014); *State* v. *Oliphant*, supra, 47 Conn. App. 281; see also *State* v. *Kenney*, supra, 53 Conn. App. 327.

The petitioner cites no legal authority supporting this claim, nor does he identify a legal source of the "duty" that standby counsel allegedly had to inform the petitioner of all potential motions. No such duty is set forth in Practice Book § 44-5, which provides: "*If requested to do so by the defendant*, the standby counsel shall advise the defendant as to legal and procedural matters. If there is no objection by the defendant, such counsel may also call the judicial authority's attention to matters favorable to the defendant. Such counsel shall not interfere with the defendant's presentation of the case and *may give advice only upon request*." (Emphasis added.)

Although the petitioner has not pointed us to any authority for his ineffective assistance of counsel claim against Romano, we find the decision of the United States Court of Appeals for the Second Circuit in *United States* v. *Schmidt*, supra, 105 F.3d 82, instructive. In

*Schmidt*, the self-represented defendant claimed that her standby counsel's representation at her criminal trial "was so deficient and prejudicial to her that it constituted ineffective assistance of counsel. Specifically, she criticize[d] his failure to call witnesses and present documentary evidence in support of her diminished capacity defense." Id., 89. In addressing the defendant's claim, the court first noted that the defendant had exercised her sixth amendment right to represent herself, that there is no constitutional right to hybrid representation and that standby counsel's duties "are considerably more limited than the obligations of retained or appointed counsel." Id., 90. Nevertheless, the court posited: "Perhaps in a case where standby counsel held that title in name only and, in fact, acted as the defendant's lawyer throughout the proceedings, we would consider a claim of ineffective assistance of standby counsel." Id. It then considered the tasks standby counsel performed during the defendant's criminal trial and concluded that such a line had not been crossed. Id., 90–91. In particular, the court noted that, during the trial, standby counsel had examined and cross-examined witnesses and delivered the closing argument. Id., 90. The court further noted that, "[a]lthough [standby counsel's] role expanded as the case continued, he did not play the same role that defense counsel normally would in preparing the strategy for a criminal defense." Id. Consequently, the court concluded that, "[b]ecause [the defendant] proceeded pro se, she may not now assign blame for her conviction to standby counsel." Id.

In the present case, the evidence reflects that Romano had a much more limited role than did standby counsel in *Schmidt*. He neither examined witnesses nor argued before the jury. Aside from a motion for disclosure pursuant to the petitioner's request that Romano contact a DNA expert, Romano did not argue any motions before the court. Romano testified that he mostly responded to requests from the petitioner, as is typical of standby counsel. The fact that Romano may have, on occasion, offered unsolicited advice does not mean that he undertook to represent the petitioner as retained or appointed counsel or somehow changed the petitioner's status from self-represented to represented by counsel. Further, the only instance in which Romano assumed the role of "full" counsel was when the court ordered the petitioner removed from jury selection on June 4, 2013, and Romano conducted voir dire of potential jurors until the petitioner resumed representing himself.[14] This interruption in self-representation lasted just one day before the petitioner, representing himself, continued with voir dire on June 5, 2013. Significantly, before jury selection resumed on June 5, 2013, the court specifically reaffirmed that Romano's role was that of standby counsel only.[15]

In addition, nothing in the record indicates that the

petitioner was confused about the role of standby counsel. The court explained to the petitioner the limited role of standby counsel when it granted his motion to represent himself. Thereafter, the petitioner never expressed to the court any uncertainty about Romano's role. In addition, the petitioner presented no evidence to the habeas court that he relied on Romano to provide unsolicited legal advice or to identify legal issues and bring them to the petitioner's attention.

As was true in *Schmidt*, Romano did not play the same role that defense counsel normally would play. Romano's actions readily fell into the category of "assist[ing] the pro se defendant in overcoming routine procedural . . . obstacles to the completion of some specific task . . . that the defendant has clearly shown that he wishes to complete." *McKaskle* v. *Wiggins*, supra, 465 U.S. 183. In fact, despite whatever assistance Romano provided to him, the petitioner unmistakably was representing himself through the conclusion of his criminal matter. As was true of the defendant in *Schmidt*, the petitioner in the present case repeatedly affirmed to the court that he was representing himself. "Having chosen to represent [himself, the petitioner] may not now be heard to complain that [his] own shortcomings spell out some sort of constitutional deprivation." *United States* v. *Schmidt*, supra, 105 F.3d 90; see also *United States* v. *Archambault*, 740 Fed. Appx. 195, 199 (2d Cir. 2018) (defendant who made opening and closing arguments to jury and examined witnesses could not assert claim of ineffective assistance as to standby counsel); *United States* v. *Morrison*, 153 F.3d 34, 55 (2d Cir. 1998) (defendant's ineffective assistance of standby counsel claim failed because defendant "retained control of his own defense throughout the proceedings"); *People* v. *Kevorkian*, 248 Mich. App. 373, 426, 639 N.W.2d 291 (2001) (ineffective assistance of standby counsel claim failed because standby counsel "did nothing to interfere with [the] defendant's right to control the case or to alter the jury's perception that [the] defendant was representing himself"), appeal denied, 465 Mich. 973, 642 N.W.2d 681, cert. denied, 537 U.S. 881, 123 S. Ct. 90, 154 L. Ed. 2d 137 (2002). Consequently, Romano was standby counsel in reality, as well as in name, and the habeas court properly denied the petitioner's claim of ineffective assistance of counsel in count six of his amended petition.

### III

The petitioner last claims that the court improperly dismissed count two of his habeas petition pursuant to Practice Book § 23-29 (2) and (5)[16] because "[this] claim [goes] to the knowing and voluntary nature of the plea, [and is] thus not waived by [the petitioner's] *Alford* plea and would provide a basis for relief." The respondent disagrees, arguing that the habeas court correctly held that the petitioner's due process claim in count two of

the habeas petition related solely to a pretrial constitutional defect and, therefore, was waived by the petitioner's guilty plea. We agree with the respondent.

"The standard of review of a motion to dismiss is . . . well established. In ruling upon whether a [habeas petition] survives a motion to dismiss, a court must take the facts to be those alleged in the [petition], including those facts necessarily implied from the allegations, construing them in a manner most favorable to the pleader. . . . The conclusions reached by the [habeas] court in its decision to dismiss the habeas petition are matters of law, subject to plenary review. . . . Thus, [w]here the legal conclusions of the court are challenged, we must determine whether they are legally and logically correct . . . and whether they find support in the facts in the record. . . .

"It is well settled that [t]he petition for a writ of habeas corpus is essentially a pleading and, as such, it should conform generally to a complaint in a civil action. . . . The principle that a plaintiff may rely only upon what he has alleged is basic. . . . It is fundamental in our law that the right of a plaintiff to recover is limited to the allegations of his complaint." (Internal quotation marks omitted.) *Zollo* v. *Commissioner of Correction*, 133 Conn. App. 266, 276–77, 35 A.3d 337, cert. granted, 304 Conn. 910, 39 A.3d 1120 (2012) (appeal dismissed May 1, 2013). "Thus, as it would do in evaluating the allegations in a civil complaint, in evaluating the legal sufficiency of allegations in a habeas petition, a court must view the allegations in the light most favorable to the petitioner, which includes all facts necessarily implied from the allegations." *Finney* v. *Commissioner of Correction*, 207 Conn. App. 133, 142, 261 A.3d 778, cert. denied, 339 Conn. 915, 262 A.3d 134 (2021).

"As a general rule, an unconditional plea of guilty or nolo contendere, intelligently and voluntarily made, operates as a waiver of all nonjurisdictional defects and bars the later assertion of constitutional challenges to pretrial proceedings. . . . Therefore, only those issues fully disclosed in the record which relate either to the exercise of jurisdiction by the court or to the voluntary and intelligent nature of the plea are ordinarily appealable after a plea of guilty or nolo contendere." (Citations omitted; footnote omitted; internal quotation marks omitted.) *State* v. *Christensen*, 157 Conn. App. 290, 295–96, 115 A.3d 1138 (2015); see also *Tollett* v. *Henderson*, 411 U.S. 258, 267, 93 S. Ct. 1602, 36 L. Ed. 2d 235 (1973) ("[w]hen a criminal defendant has solemnly admitted in open court that he is in fact guilty of the offense with which he is charged, he may not thereafter raise independent claims relating to the deprivation of constitutional rights that occurred prior to the entry of the guilty plea"). Thus, to obtain review of a nonjurisdictional claim, a petitioner must demonstrate that there

is "such an interrelationship" between the claimed error "and the plea that it can be said [that] the plea was not voluntary and intelligent because of" the error. *Dukes* v. *Warden*, 161 Conn. 337, 344, 288 A.2d 58 (1971), aff'd, 406 U.S. 250, 92 S. Ct. 1551, 32 L. Ed. 2d 45 (1972); see also *Mincewicz* v. *Commissioner of Correction*, 162 Conn. App. 109, 116, 129 A.3d 791 (2015).

On appeal, the petitioner claims that count two of his petition, if properly construed and read in the light most favorable to him, stated a claim for habeas relief because it challenged the knowing and voluntary nature of his guilty plea and, therefore, should not have been dismissed prior to a habeas trial or proceedings at which the petitioner would have had some opportunity to present evidence potentially linking his allegations with whether his decision to enter a guilty plea was knowingly and voluntarily made. Specifically, the petitioner argues that "[a] fair reading of [his] petition and counsel's arguments clearly indicate that [the petitioner] is challenging the knowing and voluntary nature of his plea [because] . . . had the state not learned of his defense strategy, [the petitioner] would not have plead[ed] guilty but, instead, would have proceeded to trial." To resolve this claim we must examine the allegations in count two of the habeas petition to determine if they properly challenged the knowing and voluntary nature of the petitioner's guilty plea, thus stating a cognizable claim for habeas relief.

In count two of the petition, the petitioner alleged that his "constitutional right to due process and the assistance of counsel [were] violated by the state's interception and possession of documents outlining the petitioner's defense strategy." Notably, the allegations did not specify *how* the interception of these documents resulted in a violation of the petitioner's rights to due process and the assistance of counsel. Nevertheless, a plain reading of the petitioner's allegations in count two, in the context of his entire second revised, amended petition, leads us to conclude that they are properly understood as asserting only a claim that, due to standby counsel's ineffective assistance, the petitioner lost the opportunity to have the charges against him dismissed based on *State* v. *Lenarz*, supra, 301 Conn. 419.[17] After setting forth the allegations regarding the interception of his correspondence, the petitioner alleged: "No attorney ever placed on the record the fact that the petitioner's privileged and confidential defense strategy had been intercepted by the prosecuting authority." The petitioner then concluded count two by alleging: "No motion to dismiss or other challenge to the violation of the petitioner's right to counsel was raised before the petitioner's guilty plea." Thus, the petitioner's complaint was not that his guilty plea was involuntary and unknowing but that the charges against him should have been dismissed.

Further, count two did not contain any allegations relating to the knowing and voluntary nature of the petitioner's guilty plea. The petitioner's allegations in count two stand in stark contrast to his allegations in count four, in which he specifically alleged that his guilty plea "was not made knowingly, intelligently, and voluntarily" because he had not been informed that sex offender treatment would be required as a result of his plea. Clearly, the petitioner and his counsel understood how to assert a claim that his guilty plea was not knowing and voluntary. They did so in count four but failed to do so in count two.

The first time the petitioner specifically argued that his guilty plea was not knowing or voluntary was in his memorandum of law in opposition to the respondent's motion to dismiss, in which the petitioner argued: "Because each alleged violation included in the amended petition is a reflection of the alleged corruption of the judicial process that induced the petitioner to enter an unintelligent and involuntary plea, none of these claims are waived by the petitioner's guilty plea that was induced by those errors. . . . Where a criminal defendant believes that it will be impossible to proceed to trial because the prosecuting authority is in possession of his entire defense strategy, a guilty plea under those circumstances can hardly be knowing, intelligent, and voluntary."

Our Supreme Court, however, has held that "a memorandum of law is not a proper vehicle for supplementing the factual allegations in a complaint . . . and we do not believe that a different rule should pertain to habeas petitions." (Citations omitted.) *Nelson* v. *Commissioner of Correction*, 326 Conn. 772, 781–82, 167 A.3d 952 (2017). Therefore, we do not consider the petitioner's memorandum of law in opposition to the motion to dismiss in determining whether count two sufficiently challenged the knowing and voluntary nature of the petitioner's guilty plea.

Moreover, at no point in the proceedings did the petitioner amend his petition to allege that his guilty plea had been made unknowingly or involuntarily due to the interception of his legal correspondence. Thus, as the respondent's counsel stated at the hearing on the motion to dismiss, "although the petitioner . . . made a number of allegations about how his will was overborne and he finally gave in . . . and [pleaded] guilty . . . [the petitioner has] raised seven counts and not a single one . . . allege[s] that his plea was not knowing and voluntarily entered."[18]

The petitioner tries to overcome this omission as it relates to count two by relying on *Finney* v. *Commissioner of Correction*, supra, 207 Conn. App. 133. In *Finney*, this court addressed the issue of "whether [a] petition should be dismissed for failing to state a claim

upon which habeas relief can be granted because the petitioner's guilty plea waived collateral attacks on his conviction that do not go to the voluntary, knowing and intelligent nature of the plea, and [the] petition [failed] to make such a claim . . . ." (Internal quotation marks omitted.) Id., 139.

In *Finney*, the self-represented petitioner filed a petition for a writ of habeas corpus, alleging that he had been improperly convicted because his trial counsel had provided him with constitutionally ineffective assistance. Id., 136–37. By way of relief, the petitioner sought to have the court allow him to withdraw his guilty plea. Id., 137. Ultimately, this court determined that, "although . . . the petition [failed] to connect expressly the asserted allegations of ineffective assistance of counsel directly to whether the petitioner's decision to enter a guilty plea was knowing and voluntary . . . it [was] reasonable to infer such an interrelationship from the allegations."[19] Id., 144. "Although ultimately it may prove that the petitioner is unable to produce evidence to support his allegations of ineffective assistance or to demonstrate any causal connection linking those allegations with his decision to enter a guilty plea, such speculation cannot support the granting of a motion to dismiss." Id.

This court in *Finney* explained that "[t]he allegations of ineffective assistance of counsel . . . reasonably [could] be construed as asserting—not expressly, but by implication—that the petitioner's decision to plead guilty was not knowingly made because his trial counsel had failed to investigate his case properly, to review the evidence against him or to consider whether a viable trial strategy existed. In other words, the allegations, read in the light most favorable to the petitioner as is required at the pleading stage, suggest that counsel failed to prepare the case adequately so that the petitioner *could have sufficient knowledge* of the strength of the case and could *make an informed decision* as to whether to plead guilty. If proven, the petitioner could be permitted to withdraw the guilty plea, which is the only relief requested in the petition. In short, read in the context of the petition as a whole, including the relief requested, we conclude that the petitioner has raised allegations that implicitly challenge whether he knowingly and voluntarily entered a guilty plea, which states a cognizable claim for habeas relief. Accordingly, the habeas court improperly granted its own motion to dismiss." (Emphasis added; footnote omitted.) Id., 146–47.

As in *Finney*, the petitioner in the present case framed count two of his petition as a sixth amendment ineffective assistance of counsel claim. Nevertheless, we conclude that, unlike in *Finney*, the allegations in count two of the habeas petition did not sufficiently demonstrate an interrelationship between the ineffec-

tive assistance of counsel and the petitioner's guilty plea such that it can be said that the plea was not made knowingly and voluntarily. See id., 143; *Mincewicz* v. *Commissioner of Correction*, supra, 162 Conn. App. 116.

First, as discussed in part II of this opinion, the petitioner represented himself. Accordingly, because there was no counsel representing the petitioner, there can be no ineffective assistance of counsel. Thus, the allegations of ineffective assistance of counsel in count two cannot demonstrate such an interrelationship between the nonexistent ineffective assistance of counsel and the guilty plea such that it can be said that the plea was not made knowingly and voluntarily. In addition, as previously noted, unlike in *Finney*, count two of the petitioner's second revised, amended petition, drafted by counsel, cannot reasonably be read as setting forth a claim that his guilty plea was not made knowingly and voluntarily.[20]

We also find it significant that the petitioner's appellate brief blends the arguments relating to his claim of ineffective assistance of standby counsel with his claim that count two was improperly dismissed: "[W]hile standby counsel did not have a duty to pursue a motion to dismiss based upon the interception of the petitioner's legal mail, he did have a duty, within the role that he created during the representation, to inform the petitioner about the significance of the issue. This was necessary in order for the petitioner to consider pursuing the issue through a motion, and *it was necessary for the petitioner to understand the implications of his guilty plea.*" (Emphasis added; internal quotation marks omitted.) Perhaps more strikingly, the petitioner argues on appeal that, "[h]ad [he] been advised by . . . Romano that a motion in accordance with *Lenarz* could be filed and that prejudice could be presumed, resulting in the dismissal of the charges against him, as [the petitioner] testified, he would have filed such a motion. . . . *Absent a showing that* [*the petitioner*] *knew of his right to pursue a motion to dismiss on this ground, and subsequently declined to proceed with its filing, it cannot be said that his plea was truly knowing and voluntary.*" (Citation omitted; emphasis added.)

It is well settled, however, that a plea is made knowingly, voluntarily, and intelligently regardless of whether the defendant was made aware of every possible motion he would be waiving as a result thereof. See, e.g., *State* v. *Johnson*, 253 Conn. 1, 42, 751 A.2d 298 (2000) ("[i]t is . . . not necessary for the trial court to canvass the defendant to determine that [he] understands that [his] plea of guilty or nolo contendere operates as a waiver of any challenge to pretrial proceedings" (internal quotation marks omitted)); *State* v. *Gilnite*, 202 Conn. 369, 383, 521 A.2d 547 (1987) ("[t]here is no requirement . . . that the defendant be advised

of every possible consequence of such a plea"). Furthermore, not knowing which motions he was able to file is exactly the kind of risk the petitioner knowingly and willingly assumed when he chose to represent himself. In fact, the trial court specifically advised him of this very risk by informing the petitioner during its canvass that there "are legal consequences if you don't file the right motions at the right time . . . ."

More to the point, as acknowledged in count two of his petition, the petitioner was fully aware of the intercepted legal mail prior to pleading guilty. In fact, he stated at his plea proceeding and sentencing hearing that, "[f]rom the inception of these charges, the Department of Correction has been holding on to my mails, turning [them] over to the prosecutor." In cases involving the claim that a guilty plea was made unknowingly or involuntarily, the petitioner typically must demonstrate unawareness of certain facts or issues when pleading guilty. For example, in *Finney*, the petitioner's allegations specifically referenced counsel's failure to prepare the case adequately so that the petitioner could have *sufficient knowledge* of the strength of the case and could *make an informed decision* as to whether to plead guilty. See *Finney* v. *Commissioner of Correction*, supra, 207 Conn. App. 146–47; see also *Dukes* v. *Warden*, supra, 161 Conn. 345 (court did not err in concluding that plea was not rendered involuntary and unintelligent as result of alleged conflict of interest when petitioner knew when he engaged counsel that counsel was representing two defendants in unrelated case in which petitioner was codefendant); *Mincewicz* v. *Commissioner of Correction*, supra, 162 Conn. App. 116–17 ("[i]f any ineffective assistance conceivably occurred, it was *antecedent to the plea* hearing and *known by the petitioner* and, as such, was effectively waived upon entry of the plea" (emphasis added)); accord *Henderson* v. *Commissioner of Correction*, 181 Conn. App. 778, 799, 189 A.3d 135 (same), cert. denied, 329 Conn. 911, 186 A.3d 707 (2018). Accordingly, the petitioner's plea was in fact made knowingly and voluntarily even if he was unaware that he could file a motion to dismiss based on *Lenarz*.

We therefore conclude that, read in the context of the habeas petition as a whole, including the relief requested, count two of the second revised, amended petition failed to allege facts that directly or implicitly demonstrated "an interrelationship" between the claimed ineffective assistance of counsel and the guilty plea such that it can be said that the plea was not made knowingly and voluntarily. The petitioner thus did not state a cognizable claim for relief. Accordingly, the habeas court properly dismissed count two of the petition.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] In his appellate brief, the petitioner also claimed that the habeas court erred in dismissing count four of the amended petition. In particular, the petitioner argued that the court improperly dismissed his claim in count four that his guilty plea was not knowing and voluntary because he was not informed that he would be ordered to participate in sex offender treatment as a result of his plea. In his appellate brief, the respondent, the Commissioner of Correction, argued that the habeas court did not dismiss the sex offender treatment claim but dismissed only the portion of count four that alleged a due process violation regarding jury selection, which occurred before the petitioner entered his guilty plea. At oral argument before this court, the petitioner's counsel abandoned the sex offender treatment claim. Consequently, we do not address it further. See, e.g., *Cunningham* v. *Commissioner of Correction*, 195 Conn. App. 63, 65 n.1, 223 A.3d 85 (2019) (declining to review claims counsel expressly abandoned at oral argument), cert. denied, 334 Conn. 920, 222 A.3d 514 (2020). Furthermore, because the petitioner mentioned but did not otherwise address in his brief the habeas court's dismissal of the jury selection claim, we deem any claim related to that ruling abandoned. See, e.g., *Antonio A.* v. *Commissioner of Correction*, 205 Conn. App. 46, 80–81, 256 A.3d 684 ("[W]e are not required to review issues that have been improperly presented to this court through an inadequate brief. . . . Analysis, rather than mere abstract assertion, is required in order to avoid abandoning an issue by failure to brief the issue properly." (Internal quotation marks omitted.)), cert. denied, 339 Conn. 909, 261 A.2d 744 (2021).

[2] "*North Carolina* v. *Alford*, 400 U.S. 25, 91 S. Ct. 160, L. Ed. 2d 162 (1970). 'Under *North Carolina* v. *Alford*, [supra, 37] . . . a criminal defendant is not required to admit his guilt, but consents to being punished as if he were guilty to avoid the risk of proceeding to trial. . . . A guilty plea under the *Alford* doctrine is a judicial oxymoron in that the defendant does not admit guilt but acknowledges that the state's evidence against him is so strong that he is prepared to accept the entry of a guilty plea nevertheless.' (Emphasis omitted.) *State* v. *Wheatland*, 93 Conn. App. 232, 234 n.1, 888 A.2d 1098, cert. denied, 277 Conn. 919, 895 A.2d 793 (2006)."

[3] See *Brady* v. *Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963) (suppression by prosecution of evidence favorable to accused upon request violates due process when evidence is material either to guilt or to punishment, irrespective of good faith or bad faith of prosecution).

[4] See footnote 1 of this opinion.

[5] Although the court never dismissed the portion of count four of the second revised, amended petition, which alleged that the petitioner's guilty plea was not knowingly and voluntarily made because he had not been informed that his plea would result in sex offender treatment, the petitioner did not pursue that claim at trial and apparently abandoned it in light of his pursuit of relief from that requirement in the criminal court. In any event, as previously noted, during oral argument before this court, the petitioner's appellate counsel expressly abandoned any claim related to sex offender treatment. See footnote 1 of this opinion.

[6] The petitioner argues that the newly discovered evidence requirement "is especially concerning for individuals situated as [is the petitioner], who was incarcerated and proceeded pro se in the underlying criminal matter." To the extent that the petitioner is suggesting that we should abandon the newly discovered evidence requirement for self-represented petitioners, we decline to do so. "[T]he right of self-representation provides no attendant license not to comply with relevant rules of procedural and substantive law." (Internal quotation marks omitted.) *Ajadi* v. *Commissioner of Correction*, 280 Conn. 514, 549, 911 A.2d 712 (2006).

[7] In his appellate brief, the petitioner acknowledges this court's binding precedent that newly discovered evidence is required to succeed on a claim of actual innocence. He maintains, however, that this precedent "remains an open question in the Connecticut Supreme Court." During oral argument before this court, the petitioner's appellate counsel stated that she raised the claim solely to preserve it for review by our Supreme Court.

[8] In *State* v. *Lenarz*, supra, 301 Conn. 419, our Supreme Court held that, when a "case is irreversibly tainted by the prosecutor's intrusion into the privileged communications [between a defendant and his attorney], the only available appropriate remedy is dismissal of the charge of which he was convicted." The court explained "generally that prejudice may be presumed when the prosecutor has invaded the attorney-client privilege by reading privileged materials containing trial strategy, regardless of whether the invasion of the attorney-client privilege was intentional. We further conclude

that the state may rebut that presumption by clear and convincing evidence. Finally, we conclude that, when a prosecutor has intruded into privileged communications containing a defendant's trial strategy and the state has failed to rebut the presumption of prejudice, the court, sua sponte, must immediately provide appropriate relief to prevent prejudice to the defendant." Id., 425–26.

[9] Practice Book § 44-4 provides in relevant part: "When a defendant has been permitted to proceed without the assistance of counsel, the judicial authority may appoint standby counsel, especially in cases expected to be long or complicated or in which there are multiple defendants. A public defender or special public defender may be appointed as standby counsel only if the defendant is indigent and qualifies for appointment of counsel under General Statutes § 51-296, except that in extraordinary circumstances the judicial authority, in its discretion, may appoint a special public defender for a defendant who is not indigent."

[10] General Statutes § 54-56d provides in relevant part: "(a) A defendant shall not be tried, convicted or sentenced while the defendant is not competent. For the purposes of this section, a defendant is not competent if the defendant is unable to understand the proceedings against him or her or to assist in his or her own defense. . . .

"(d) If the court finds that the request for an examination is justified and that, in accordance with procedures established by the judges of the Superior Court, there is probable cause to believe that the defendant has committed the crime for which the defendant is charged, the court shall order an examination of the defendant as to his or her competency. . . ."

Although the focus of the competency evaluation is the defendant's competency to stand trial, the court stated that it was ordering the evaluation "specifically for the purpose of determining [the petitioner's] competence to represent himself at trial . . . ." We note that, strictly speaking, once a defendant is found competent to stand trial, the rules do not provide for a separate competency determination as to the waiver of the right to counsel and the right to self-representation. Instead, Practice Book § 44-3 provides: "A defendant shall be permitted to waive the right to counsel and shall be permitted to represent himself or herself at any stage of the proceedings, either prior to or following the appointment of counsel. A waiver will be accepted only after the judicial authority makes a thorough inquiry and is satisfied that the defendant:

"(1) Has been clearly advised of the right to the assistance of counsel, including the right to the assignment of counsel when so entitled;

"(2) Possesses the intelligence and capacity to appreciate the consequences of the decision to represent oneself;

"(3) Comprehends the nature of the charges and proceedings, the range of permissible punishments, and any additional facts essential to a broad understanding of the case; and

"(4) Has been made aware of the dangers and disadvantages of self-representation."

Nevertheless, the petitioner made no claim in his habeas petition regarding the court's use of a § 54-56d competency evaluation in connection with his request to waive his right to counsel and to represent himself.

[11] The following colloquy occurred between the court and the petitioner:

"The Court: Now, you want to proceed without an attorney. Is that what you indicated?

"[The Petitioner]: Yes, Your Honor.

"The Court: Do you want an attorney to be on standby to help you file the legal motions, sir? You can have that option.

"[The Petitioner]: Okay. I'm not sure at this point, to be quite honest with you.

"The Court: Well, what I'll do is, I'll appoint one for standby just to assist you in the law. Do you understand that?

"[The Petitioner]: Okay.

"The Court: But it's—the attorney will be assisting you in the legal aspect of it. Do you understand?

"[The Petitioner]: Okay. . . .

"The Court: What I'm going to do is order standby counsel, order Attorney Romano to do that. You are to consult with him whenever you need assistance in filing those legal motions that you have. Do you understand that? And that's assistance, so that you don't do something in the motion that's going to cause the motion not to be heard or not to be properly filed, so that you have the basis of the law covered in the motion, so that you're preserving your record. Do you understand that, sir?

"[The Petitioner]: Yes, I understand that, ma'am."

[12] The following colloquy occurred between the court and Romano:

"The Court: You are standby, counsel. You're the only one prepared to

go forward right now. Bring in the jury. . . .

"[Romano]: Your Honor, I do have another request, if I may?

"The Court: Yes.

"[Romano]: The request is, if Your Honor is—am I right in assuming that you're directing me to go forward in abstentia as standby—

"The Court: Yes.

"[Romano]: —counsel? Are you now appointing me as full?

"The Court: Yes."

[13] The record is unclear as to whether a mistrial was declared. Nevertheless, jury selection was not completed, and a jury was not empaneled.

[14] The petitioner does not raise a claim of ineffective assistance of counsel with respect to the manner in which Romano conducted voir dire on June 4, 2013.

[15] The following colloquy occurred between the court and Romano:

"[Romano]: Your Honor, if—just a question with respect to the procedures. If at any point during the voir dire [the petitioner] has questions of me, how would you like to field that?

"The Court: At the end of his voir dire, he can ask whatever questions he wishes of you, briefly, but we're not going to have two attorneys. He's representing himself.

"[Romano]: I understand.

"The Court: Yes.

"[Romano]: I just wanted to clear up the procedures so he understands and I know what my role is and he knows what his role is—

"The Court: His role is—

"[Romano]: —and it's clearly defined.

"The Court: —to conduct the voir dire. Your role is standby counsel—

"[Romano]: Thank you very much.

"The Court: —to address legal questions, not factual questions, legal questions."

[16] Practice Book § 23-29 provides in relevant part: "The judicial authority may, at any time, upon its own motion or upon motion of the respondent, dismiss the petition, or any count thereof, if it determines that . . .

"(2) the petition, or a count thereof, fails to state a claim upon which habeas corpus relief can be granted . . .

"(5) any other legally sufficient ground for dismissal of the petition exists."

[17] See footnote 8 of this opinion.

[18] As we previously noted, this statement is not accurate, as the petitioner did allege in count four that his plea was not knowingly and voluntarily made because he had not been adequately advised of the requirement that he undergo sex offender treatment.

[19] This inference was "particularly true given the early stage of the proceedings and the fact that the petition was filed by a self-represented party." *Finney* v. *Commissioner of Correction*, supra, 207 Conn. App. 144.

[20] In reaching our decision, we are mindful that, unlike in *Finney*, the petitioner in the present case was represented by counsel when he filed the second revised, amended habeas petition. Accordingly, there is no reason to construe the allegations in the petition with the same degree of leniency this court used in *Finney*. Cf. *Gilchrist* v. *Commissioner of Correction*, 334 Conn. 548, 560, 223 A.3d 368 (2020) ("when a petitioner has proceeded [as a self-represented party] . . . courts should review habeas petitions with a lenient eye, allowing borderline cases to proceed" (internal quotation marks omitted)); *Kaddah* v. *Commissioner of Correction*, 299 Conn. 129, 140, 7 A.3d 911 (2010) (cautioning that courts "should be solicitous to [self-represented] petitioners and construe their pleadings liberally in light of the limited legal knowledge they possess").